**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHWESTERN DIVISION**

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | **ORDER DENYING DEFENDANT'S** |
| | ) | **MOTION TO SUPPRESS EVIDENCE** |
| vs. | ) | |
| | ) | Case No. 4:09-cr-066 |
| Richard Carroll Trainor, | ) | |
| | ) | |
| Defendant. | ) | |

_____

Before the Court is the Defendant's Motion to Suppress filed on December 17, 2010.

See Docket No. 39.  The Government filed a response in opposition to the motion on December 22,

2010.  See Docket No. 44.  On January 20, 2011, an evidentiary hearing was held in Minot, North

Dakota.  The trial is scheduled for March 22, 2011.  The Court denies the motion for the reasons set

forth below.

## I.      BACKGROUND

The defendant, Richard Carroll Trainor, was initially indicted on one count of possession of

material involving the sexual exploitation of minors.  See Docket No. 1.  The superseding indictment

includes the same initial count and adds two additional counts – receipt of materials involving the

sexual exploitation of minors and another count of possession of material involving the sexual

exploitation of minors.  See Docket No. 35.  On December 17, 2010, Trainor filed a motion to

suppress certain evidence.  See Docket No. 39.

On August 21, 2009, at approximately 5:30 am, Special Agents Ryan O'Neil with the

Federal Bureau of Investigation (FBI) and Mike Marchus with the North Dakota Bureau of Criminal

Investigation (BCI), along with a uniformed Ward County police officer, executed an arrest warrant

of Trainor.  Trainor was standing outside his Minot, North Dakota residence when the agents approached him and indicated that he was being placed under arrest pursuant to an arrest warrant. Trainor did not resist arrest, but requested that the agents allow him to enter the residence to drop off some personal belongings before being transported to jail.  The agents allowed Trainor to do so and escorted him into the residence.  While inside, the agents had contact with Trainor's landlord and roommate, Gene Modin.

Trainor was then escorted to a Minot Police Department vehicle, transported to the jail, and turned over to the Minot Police Department.  After Trainor left, Special Agent O'Neil went into the residence to interview Modin.  Modin told Special Agent O'Neil that he (Modin) owned the trailer he lived in and rented a room to Trainor.  Special Agent O'Neil asked about the desktop computer and equipment located in the living room area of the residence.  At the hearing on January 20, 2011, Modin testified that two computers were in the living room, one belonging to Modin and one belonging to Trainor.  Modin testified that he used Trainor's computer occasionally and, while he did not need to ask permission to use it, Modin generally did so out of politeness.  Modin said that the internet bill was in Modin's name, but that Trainor and Modin split the cost of internet service. Special Agent O'Neil obtained Modin's consent to search the residence and Trainor's computer and equipment in the living room.

Special Agent O'Neil began the search by accessing the computer equipment.  He discovered images that appeared to depict the sexual exploitation of minors, i.e., child pornography, and what appeared to be a home-made video of Trainor sitting at the same computer console visibly viewing images that appeared to depict the sexual exploitation of minors.  Special Agent O'Neil seized the computer and its related peripherals, including a digital camera which was later determined to be

the camera that recorded the video of Trainor viewing the suspect images.  A search warrant was later obtained.

A forensic search of the computer identified 286 videos and 489 still images which allegedly depict images of child pornography.  The images discovered on the computer are in addition to 72 videos previously discovered as the basis of the original indictment and count one of the superseding indictment.

Trainor argues that the search of his residence in Minot was unconstitutional and the suppression of evidence obtained during the search is required.  Trainor contends that law enforcement officers removed him from the residence in order to obtain consent from his landlord/ roommate (Gene Modin) to search the residence, computers, and computer-related equipment.  The Government contends the evidence should not be suppressed because Trainor was removed from the scene pursuant to a valid arrest warrant, and he was not removed in order to obtain consent to search from the roommate.

## II.     LEGAL DISCUSSION

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  The "central requirement" of the Fourth Amendment is reasonableness.  Illinois v. McArthur, 531 U.S. 326, 330 (2001).  The reasonableness of the search is determined "by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests."  Wyoming v. Houghton, 526 U.S. 295, 300 (1999).  The general rule is that law enforcement officers must secure a warrant before conducting a search.

Katz v. United States, 389 U.S. 347, 357 (1967); United States v. Alberts, 721 F.2d 636, 638 (8th Cir. 1983).

There are exceptions to the general warrant requirement.  The United States Supreme Court has explained that "a warrantless entry and search by law enforcement officers does not violate the Fourth Amendment's proscription of 'unreasonable searches and seizures' if the officers have obtained the consent of a third party who possesses common authority over the premises." Illinois v. Rodriguez, 497 U.S. 177, 179 (1990) (citing United States v. Matlock, 415 U.S. 164 (1974)); see United States v. Janis, 387 F.3d 682 (8th Cir. 2004) (finding the same).

Trainor does not dispute that the owner of the residence and his roommate, Gene Modin, gave the agents his consent to search the residence, and that Modin possessed common authority over the areas searched.  However, a single occupant's consent is not always sufficient to permit a search of the residence.  "[A] warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." Georgia v. Randolph, 547 U.S. 103, 120 (2006).  "In the absence of such a refusal, a third party's consent to search is valid '[s]o long as there is no evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection.'" United States v. Brewer, 588 F.3d 1165, 1169 (8th Cir. 2009) (quoting Randolph, 547 U.S. at 121) (alterations in original).  Further, law enforcement "officers have no affirmative duty to advise a potentially objecting defendant of their intent to search." Id. at 1170 (citing Randolph, 547 U.S. at 121).

On January 20, 2011, the Court heard testimony that while Trainor was in the Ward County jail on or about January 16, 2008, FBI Agent O'Neil attempted to question Trainor about the charge

in the initial indictment.  Trainor was in the Ward County jail on an unrelated traffic violation.

Agent O'Neil apparently asked Trainor if he would sign a waiver of his *Miranda* rights and Trainor

refused.  Trainor argues that the refusal in 2008 to waive his *Miranda* rights shows that Agent

O'Neil knew or should have known that if asked to search the home and computer on August 21,

2009, Trainor would have objected.

FBI Agent O'Neil testified that he went to Trainor's residence on August 21, 2009 to execute

an arrest warrant and that he had no intent to search the residence at that time.  Agent O'Neil

testified that the only reason he and BCI Agent Marchus went into the residence is because Trainor

asked to do so in order to leave some personal belongings, i.e., wallet, money, and keys, in his

bedroom before being transported to jail.

BCI Agent Marchus also testified at the suppression hearing.  Agent Marchus confirmed that

there had been no discussion among the officers about searching the residence the morning of the

arrest.  Marchus confirmed that he and FBI Agent O'Neil only intended to arrest Trainor and

transport him to jail.  Marchus said the officers did not intend to conduct a search that morning and

only went into the residence because Trainor requested to leave some personal belongings in his

residence.

Upon entering the residence, Agent O'Neil testified that he probably did a quick plain view

search of the home to see if anyone else was present.  According to Agent O'Neil, Trainor informed

him that he had a roommate who was asleep at the time.  Agent O'Neil testified that he did not ask

for Trainor's consent to search the home or computer because he was only concerned about making

a safe arrest at that time.  Agent O'Neil further testified that he first became suspicious of the

computer and equipment in the living room while leaving the residence with Trainor.  After the

arrest was safely executed, Agent O'Neil returned to the residence.  Agent O'Neil testified that he believed Modin had full authority to consent to the search because Modin owned and had control and authority over the premises.

The undisputed evidence reveals that FBI Agent O'Neil and BCI Agent Marchus had a valid arrest warrant to serve upon Trainor.  Once served, Trainor was properly transported to a local jail facility for booking.  The Court finds that Trainor was removed from his residence pursuant to a valid arrest warrant and  not "'for the sake of avoiding a possible objection' to the search." Brewer, 588 F.3d at 1170 (quoting Randolph, 547 U.S. at 121).  The testimony of FBI Agent O'Neil and BCI Agent Marchus is credible and straightforward, particularly as it relates to their intentions the morning that Trainor was arrested.  There is no evidence in the record before the Court that the law enforcement officers removed Trainor from the residence in order to obtain the landlord's consent to search the residence and thereby avoid any possible objection from Trainor to a search.  The Court finds that the law enforcement officers acted in good faith and had no intention to enter the residence during the early morning hours.  The only reason the officers entered the residence after arresting Trainor outside was because Trainor asked to go into the residence in order to leave his wallet, money, and keys in his room rather than take those items with him to jail.  Accordingly, the Court finds that FBI Agent O'Neil's warrantless search of the computer and equipment in Trainor's residence after first obtaining the owner and roommate's consent was reasonable and warranted under the circumstances.

## III.    CONCLUSION

The Court finds that Special Agent Ryan O'Neil's warrantless search of the computer equipment located in the residence owned by Gene Modin, after first obtaining Modin's consent, was reasonable under the Fourth Amendment.  Modin was the sole owner of the residence and had rented a room to Defendant Richard Trainor.  Modin possessed common authority and control over the shared areas of the residence searched and the items seized.  The Court finds there is no evidence that the law enforcement officers removed Trainor from the residence for the purpose of avoiding a possible objection from Trainor to conduct a search on the morning of the arrest.  Trainor's motion to suppress evidence (Docket No. 39) is **DENIED**.

**IT IS SO ORDERED**.

Dated this 26th day of January, 2011.

/s/ Daniel L. Hovland
Daniel L. Hovland, District Judge
United States District Court